Johnston, Ch.,
dissenting. Lewis Kirkland, whose wife was entitled, for life, to an interest in certain settled property, had received from Cave, the trustee, in February, 1836, a negro woman Lucy, cattle of the value of one hundred and twenty dollars, and cash, capital of the trust, to the amount of four *362 hundred dollars. The wife died in 1849, which determined her interest.
Cave thereupon filed his bill against Lewis Kirkland, the husband of the life tenant, for the restoration of the trust property, to answer the ulterior provisions of the settlement. In this bill it was alleged, that the husband had committed adevastavit by selling Lucy and applying the proceeds to his own use, and by vesting the four hundred dollars, which he had received in cash, in the purchase of two slaves, Nimrod and Comba, the titles to whom he took in his own name. The bill prayed that the stock of cattle be replaced, that the negro which had been sold be restored or her value accounted for, and that the negroes purchased with the trust funds be declared parcel of the trust estate, and delivered over as such, or their value, or the funds employed in the purchase, accounted for; and for general relief.
In the bill it was also alleged that the defendant was deeply embarrassed, and had exhibited evidence of an intention to remove himself with his property, including the slaves Nimrod and Comba-, beyond the jurisdiction of the Court.
This bil-1 was sworn to.
Under these circumstances, and before the cause was brought to a hearing, the commissioner of the Court, Mr. Aldrich, made an order “That the said Lewis Kirkland do give bond and good surety, in the penal sum of thirteen hundred dollars, conditioned for the forthcoming of the cattle and the slaves Nimrod and Comba, named in the bill, to be subject to the final order of the Court in the premises; and also, conditioned that he, the said Lewis Kirkland, shall abide by and perform such orders and decrees as the Court shall make in the premises.” And on the 7th May, 1849, Lewis Kirkland gave to the commissioner his bond, with Wm. Kirkland as surety, conditioned that, “ if the above named Lewis Kirkland, his heirs,” &c., “shall truly cause certain property, to wit: twenty head of cattle and two slaves, named Nimrod and Comba, to be forthcoming, to be subject to *363 the final order of the Court of Equity, in a certain cause of Matthew J. Cave, trustee, vs. Lewis Kirkland and others, filed the 5th May, 1849; and if the above bound Lewis shall abide by and perform such orders and' decrees as the said Court shall make in the said cause, without fraud,” &e.
The bill was subsequently taken pro confesso: and a reference was held by the commissioner: who reported:
“ Lewis Kirkland, in account with Matt. J. Cave, trustee.
“ 1836, Feb. 11, To value of Negro Lucy delivered to Kirkland by trustee, and sold by Kirkland, $500 00
“18.36, Feb. 11, To cash paid Kirkland by trustee, 100 00
“ 1836, Feb. 11, To cash paid Kirkland for land, 300 00
“1836, Feb. 11, To value of cattle, 120 00
$1020 00
“ 1851, Feb. 20, Interest to date, on $900 00, from 20th April, 1849, when Mrs. Kirkland died, $110 00
$1130 00
“ 1836, Feb. 11. Deduct one-third, L. Kirkland’s share, $376 66
“1836, Feb. 11. Deduct sale (of cattle, 93 15
$469 81
“Balance due M. J. Cave, trustee, $660 19”
And on the 14th February, 1851, the following was passed as the final order in the cause:
“ On hearing the report of the commissioner in this cause, it is, “on motion of Bellinger & Hutson, complainant’s solicitors, “ ordered that the same be confirmed and made the judgment “of the Court: — and that the defendant, Lewis Kirkland, do “ pay to the commissioner, (to be by him invested in good bonds *364 “and personal securities,) the amount reported to be due by “ the said Lewis Kirkland: and that the said Lewi's Kirkland “ do pay the costs of this suit. It it is further ordered, that “ unless the said Lewis Kirkland do, by the 5th day of March “ next, fulfil the conditions of the bond given by him in this “ cause, dated the 7th May, 1849, the commissioner do put the “ said bond in suit. Feb. 14, 1851.
“Benjamin F. Dunkin.”
The bond was put in suit accordingly, against Wm. Kirkland, the surety. On the trial, as I learn from the judge’s report, it was shown that Nimrod, shown to be worth four hundred dollars, was killed by Lewis Kirkland, the defendant in equity, on the 1st of October, 1849, after the bill was filed against him: and that pending the suit in equity, to wit, on the 7th of May, 1849, the same day on which the bond was given, Lewis Kirkland confessed a judgment to Wm. Kirkland, to indemnify him as surety on the bond: under which the slave Comba was subsequently purchased by Wm. Kirkland at the price of one hundred and five dollars. And it further appeared that Lewis Kirkland was insolvent.
The judge ruled that there was no breach of the bond; and nonsuited the plaintiff. An appeal was taken from that decision : and from the Law Court of Appeals the appeal has been removed to this Court for adjudication.
Whether there was any decree for the production of the slaves, Nimrod and Comba, or not, there was certainly a decree for the sum of six hundred and sixty dollars and nineteen cents; and the terms of the bond being (among others,) that “ the above bound Lewis shall abide by and perform such orders and decrees as the said Court shall make in the said cause,” — the non-payment of this money was a clear breach of this condition, if the bond was not void.
If the final order gave Lewis the privilege of obviating the *365 money decree by the delivery of the negroes within the time limited in that order, then the production of the slaves became an alteimate condition; and, on non-complianee with it, the bond called for the money: so that the eventual breach was the non-payment of the money, — the equivalent or substitute of the negroes.
But it has been argued that the commissioner had no authority to require a bond from a defendant in equity, obliging him. to pay whatever sum might be eventually decreed against him in money, whether decreed alternatively or directly.
This objection necessarily implies that although the condition of the bond in this case, for the payment of money, is broken by the failure to pay it; — yet the Court, of law is to regard it no breach, (contrary to the very words of the instrument,) if it can be satisfied that the commissioner erred in inserting that condition.
This proposition palpably involves the question, how far one' co-ordinate Court is authorized to enquire into, or review, the proceedings in another co-equal and co-ordinate Court of superior and.undefined jurisdiction.
Now, it is freely admitted that there is a boundary to the authority of every Court; and if it transcends that boundary its acts are null. As if a Chancery Court were to assume a criminal jurisdiction, and try, convict and punish in capital cases. Or, if a Law Court should assume chancery powers, and administer trusts. But it is a universal principle that the proceedings of all Courts, not of limited jurisdiction, upon subjects of which they have jurisdiction, are not examinable collaterally in any Court. Not in the same court; — because a collateral examination might serve to surprise the parties, and deprive them of the aid of those ^circumstances by which the proceedings might, if directly investigated, be sustained: take away the confirmatory effect of acquiescence, or consent, which may have cured the proceeding: and obscure the light which a more direct examination of the subject might afford the Court *366 in coming to a proper decision. Not in a Court of concurrent, jurisdictiob: because, in addition to tbe reasons already given, such a course would necessarily lead to conflict of jurisdictions, to irremediable confusion of rights, and to intolerable oppression of the sureties. And certainly, not in merely a co-ordinate Court of diverse jurisdiction, — because in addition to all the reasons just given as to Courts of identical and concurrent jurisdiction, such a proceeding would amount to the assumption of a jurisdiction altogether foreign to the functions of the Court undertaking the examination.
In the latter case, it may be added that there would be a seeming trespass on the constitution under which all the Courts in this State hold their authority. That instrument vests the judicial power distributively, in such Courts of law and equity as the legislature may create and establish, and provides for a responsibility to the legislature for the administration of these judicial trusts. If one of the trustees, so to speak, should abrogate the act of another and distinct trustee, it would savor of the assumption of a duty for which he was not commissioned, and frustrate that other in an attempted performance of his appropriate duty: besides drawing his acts ad aliud examen, away from that forum constitutionally instituted for this investigation.
The true doctrine, it appears to me, is plainly this, — that the proceedings in all Courts of superior jurisdiction upon subjects within their cognizance, are valid until set aside: and can be set aside only in a direct proceeding for that purpose: which proceeding can take place only in the same Court, or in an Appellate Court sitting in the same jurisdiction.
The mere incorrectness of any proceeding in a cause, in any Court; its inaccuracy or want of exact conformity to the settled practice of that Court, do not so vitiate the proceeding itself as t<5 render it null. There must be a want of jurisdiction on the subject matter to produce that result. The mode of administering its jurisdiction must be left to every Court: and *367 no other Court can safely undertake to regulate its practice. Every Court, — and we have daily examples of the fact, — is liable to erroneous judgments both as to practice and doctrine; but it is not the province of any other Court to correct them. They are to be corrected only in the regular course of appeal, where the matter is drawn directly under examination.
Suppose a Court, in a matter of ne exeat, orders an injunction bond; and the party acquiesces; and the Court and the other parties, depending on what has been done, and not questioned, proceed to a final decree accommodated to that order and bond: what an injustice would be perpetrated if that Court should at a future day allow the party to take an exception which he had foregone at the proper time, and permit the record to be garbled, and the order and bond to be rescinded and set aside ? How much higher injustice would be perpetrated if another and co-ordinate and not a superior Court, should undertake, not to set them aside or rescind them, but to pronounce them invalid ?
The view I am taking is not new to me. So long ago as 1882, in my second year, I held- the same doctrine.' In Maxwell vs. Conner, (a) I upheld the erroneous judgment of the Law Court, because it was rendered on a matter within its jurisdiction: and I refused to review or correct it: and, moreover, although the same jurisdiction belonged to my own Court, as a concurrent Court, I denied a remedy to the party aggrieved, because, while entitled to it, in either Court, he had submitted to the erroneous judgment of a competent forum. My decision, in all the views I advanced, was affirmed by the Court of Appeals of that day.
I paid the same deference to the decision of a Court in a sister state, in Johnson vs. S. W. R. R. Bank, (b) however much I may have doubted its correctness.
Johnson, J.,
in The State vs. Scott, (c) — speaking even of an *368 inferior Court, created by statute for special purposes, said:— “ It is difficult to conceive of a proposition more obvious, than that, prima facie, every Court must possess the power of judging of its own jurisdiction, both in relation to the persons of the parties and the subject matter of litigationand held that the party having submitted to the jurisdiction, afterwards came too late to correct the judgment.
In Gist vs. Bowman, (d) we have a singular proof of the extent to which matters would proceed if it were permitted to one Court to invalidate, or disparage the proceedings of another collaterally. An attachment had been issued to compel an answer in chancery; and a discharge under habeas corpus was moved for on the ground that a single Chancellor could not authorize the attachment. It seems the point was gravely debated, but, as might have been expected, the Judges “ were all of opinion, that they had no jurisdiction of the matter: it belonged exclusively to the Court of Equity.” The case is amusing as well as instructive. Would that Court have discharged Kirkland if he had applied to them before giving his bond? or would it have said it “had no jurisdiction of the matter: — it belonged to equity ?”
Ex parte Gilchrist, (e) was a case in which the applicant was in custody under a writ of ne exeat issued by the commissioner in equity for Chester, and moved for discharge on the ground, that the bill filed did not state a casein which the commissioner had power to order a writ of ne exeat. HuseR, J., refused to look into the bill for such a purpose. Upon appeal, JOHNSON, J., delivered the opinion of the Court in terms so manly and so wholesome that I shall take the liberty of repeating here several passages from his judgment. “ The Act,” says he, “invests the commissioner with the power of the Chancellor in relation to granting orders for the writ of ne exeat, in all cases of practice.” “ In the organization of the judicial department of the government, certain powers were assigned to the different tribunals, *369 corresponding with the nature and extent of the jurisdiction confided to them: and, in the exercise of those powers, — except so far as the right of appeal is given, — the most subordinate are as absolute and authoritative as the tribunals in the last resort.” “And I should deprecate, — even more than the repeal of the habeas corpus Act, — that state of things in which tribunals, without the forms of lazo would be permitted to review and control the judgments of each other ad libitum. The habeas corpus Act certainly confers no such power. Its object was to secure the citizen from illegal and arbitrary imprisonment: and the wildest speculations have never yet carried it so far as to subvert all law and order: for, even in the case of Yates v. Lansing, (f) than which, perhaps, no case was ever more warmly contested, the bone of contention was whether the Chancellor had jurisdiction over the subject matter for which he caused the plaintiff to be attached.” “ The presiding Judge had no more power to discharge” the prisoner “ than the commissioner would have had to discharge a culprit committed for execution by a Court of Sessions.”
This is sound, conservative, and wholesome doctrine. The Court would not inquire whether the case authorized the issue of a ne exeat: but leaving that inquiry to the review of the Court in which the order was made and whose jurisdiction was concerned, dismissed the application, as unauthorized by sound principles of proceeding. I beg that this judgment may not be forgotten, when we hereafter touch upon the question, whether the order of Mr. Aldrich was justified by the circumstances of the case before him.
In McKee vs. Council of Anderson, (g) the case turned upon the question, whether the tribunal whose decision was under consideration, had or had not jurisdiction of the subject matter, and being found to have it, the Court refused to interfere.
In Brown vs. Gibson, (h) when the power of an Ordinary to revoke probate of a will made by his predecessor was ques *370 tioned, all tbe parties in- interest not being before tbe Court, JOHNSON, J., said: “The decree of the Court of Ordinary, revoking tbe probate of the will, was the judicial act of a court possessing jurisdiction over the subject matter of dispute, and the law holds the exercise of this right so sacred, that no evidence will be permitted to control it, in relation to the subject of dispute, so long as it remains unreversed by the order of a superior tribunal; (i) and this can only be done on an appeal to the Court of Common Pleas, in the manner pointed out by 'the Act of Assembly.”
And in Starke vs. Woodward, (k) where after going into equity for the assertion of title to negroes, and losing his case, the defendant resisted the plaintiff’s title at law, and undertook to contest the decree in equity which had been rendered against him, Justice Nott, in a very clear opinion ruled the case against him, referring to authority to sustain the position that the judgment of a competent tribunal on a subject of its jurisdiction is conclusive, so long as it stands, on all other tribunals. The cases mentioned by him are clear to the point: among which is that of Maingay vs. Gahan, (l) where Lord Chancellor Fitz-gibbon, sitting with all the judges in the Exchequer Chamber of Ireland, says, “ sitting in a court of law, I am not at liberty to enter intoan examination of the justice or injustice of any judgment of a court of competent jurisdiction, unless it comes before me by a writ of error. All parties to such a judgment are bound by it, until it is reversed by a court having authority to review it.”
Harvey vs. Huggins, (m) covers nearly every principle involved in the present case. Harvey had obtained a decree in equity against one Murrel for about $6,000 : and, in order to compel payment of this sum, sued out and lodged with Huggins, the sheriff, successively a fi. fa., an alias, pluries and second pluries. The first fi. fa. and the alias were returned nulla bona. Under the first pluries Murrel’s land was sold ; and under the *371 second pluries three of his negroes. These sales left due on the decree four thousand fire hundred dollars.
Previous to the issuing of the second pluries, upon affidavit that Murrel was preparing to remove certain of his negroes out of the jurisdiction, Chancellor De Saussure ordered that a writ in the nature of a writ of ne exeat issue, “ to compel Murrel to give bond with sufficient sureties” that he would not remove the property. Murrel was arrested, and was subsequently permitted by the sheriff, to go at large, without being legally discharged. The escape was permitted after an ineffectual application had been made to Chancellor De Saussure to set aside his order. Harvey brought an action against Huggins, the sheriff, for the escape, and got a verdict; and on a motion by way of appeal to set it aside, O’NeaIiL, J., delivering the opinion of the Court, after stating the grounds taken in support of the motion, the first of which was, “ that the process under which Murrell was confined was void,” proceeded to say: “ To establish the first ground, it ought to have been shown that the Court of Equity had no jurisdiction of the case in which the process was issued.” “But it is conceded that the Court had jurisdiction: and the whole force of the objection is, that the process was not according to the practice of that Court, and not warranted by it. This, I have no doubt, is true: and I have as little doubt, that, on a proper application by Murrel, the Court of Hquity would have set it aside. But this not having been done, it is a subsisting process of a Court of competent jurisdiction, in a cause within its jurisdiction. In a court of law, it must be taken to have been regularly issued ; for each court is the judge of its own proceedings. Both are co-ordinate tribunals, possessing equal powers over the cases, respectively, within the jurisdiction of each; and neither has the right to look into, or correct, in point of form, the proceedings of the other.” This is a very important judgment, and I trust that no part of it will be forgotten in the discussion of other points hereafter to be noticed in this case.
*372 It will be observed that I bave quoted no eases but those of our own courts, and none, hardly, but those of courts of law. I could extend the list of cases, almost indefinitely, by referring to those of foreign courts and our own cases in equity, all of which are to the same effect. But I stop here, having demonstrated, as I conceive, that if this Court, sitting as a law court, and administering a law jurisdiction, in a law case, should undertake to annul the bond now in suit, or the order under which it was taken, from an apprehension that the papers are not in conformity to equity practice, it will contradict the well settled doctrine of our law courts themselves.
I assume that the Court in which I now sit is as to this case purely a law court. As a law court, it is, in this case, superior to the law court from which the case comes; because that case is brought directly before it, by way of appeal, for review. But in respect to the proceedings in equity, which are not appealed from, it is as strictly a co-ordinate court as are the Circuit and Appeal Courts in law. It has no right to review, collaterally, the proceedings in equity ; but must give effect to them, as subsisting judicial records, until they are vacated in the regular way.
In this discussion I have also hitherto assumed, that the acts of the commissioner were acts within his jurisdiction, and which he was competent to perform ; and I have furthermore assumed, that however irregular his practice may have been, they were done under the supervision of the Court, and constituted, when performed, parcel of the proceedings in the case; and, as such, part of the record.
Am I right in these assumptions ? The commissioner is not merely a ministerial officer. His acts are not, in all cases, merely ministerial. This officer is not the creature of statutory law; but existed, with powers and functions established by usage, anterior to any enactment in this State. By statute he is authorized to make all orders which a Chancellor could make in the preliminary stages of causes in court, so as to *373 prepare and clear the way for a full and unobstructed decision of each case, according to its character when it comes on to be heard. And in his common law character, he is authorized to do all acts, ancillary to the Chancellor, to enable him to make a just and efficient final disposition of the case. All these acts are done under the control and supervision of the Chancellor: and, when brought regularly before him, may be corrected, modified or rescinded. But, if acquiesced in, or cured by consent, they remain as proceedings in the cause.
Now, if the order passed by Mr. Aldrich was not regular, according to equity practice, was it proper in the parties affected, to steal away to another distinct forum, to get its opinion on the matter, instead of making their complaint in the regular way, and in due form, in the Court where the irregularity or injustice was done? a Court which, alone, was entitled, and bound, to investigate the particxtlar circumstances by which the act done might be justified or condemned: which alone could bring these circumstances before it by a direct examination ; and which may be supposed as well qualified, at least, to judge of and regulate the practice and the doctrines of its jurisdiction, as another and foreign court.
When one independent court undertakes to investigate the practice, the powers, and the principles of another distinct court, it is liable to many mistakes; and if it infers from the past, what ought to be its present modes of procedure, it subjects itself to much error of judgment. For example, the order made in Harvey vs. Murrel, and referred to in Harvey vs. Huggins, was thought by a law Judge to be quite extraordinary ; and yet, it would bear much discussion in an Equity Court, whether the circumstances of the case did not call for just such an order. Again, if before Gadsden vs. The Bank, the question had been submitted to the opinion of a law court, whether such an order as was made and approved in that case, was justified by equity precedents, it might have entertained very grave doubts on the subject. I turn, again, to Young vs. *374 Burton, where the equity jurisdiction in relation to the delivery of specific slaves was for the first time established ; and I ask, with sincerity, if before that decision, a master, or commissioner in equity, had made an order looking to such a remedy as that case legitimated, would a law court have regarded his order as conforming to the practice within the equity jurisdiction ?
It is not necessary in this case to establish the exact propriety of Mr. Aldrich’s order. It is sufficient if he was acting within his jurisdiction when he made it. But I may be permitted to look-a little to the circumstances in which he passed the order, for the purpose of discovering whether he committed so great a trespass as has been suggested.
The bill was one in which the allegation, sworn to at the time, and never at any time contradicted, was that a life-tenant, himself a trustee for those in remainder, had sold a trust slave and pocketed the proceeds to his private use, and had, without authority, vested cash trust funds in slaves, taking the title to himself, and was embarrassed, and on the eve of absconding with all his tangible property. The prayer of the plaintiff in that case was for specific relief by a decree for the negroes, or for an account of their value. This was the case before the commissioner and in which he was to make an interlocutory order to remove all impediments to a fair and full decree, such as the plaintiff in such a cause was entitled to. Would it have been an unfair, or improper final decree in such a casé for the Court to have directed that the negroes be delivered up, and that the defendant be excused from -that judgment only upon paying their ascertained value ?
From the bill, would not Mr. Aldrich have been justified in anticipating that such a decree might eventually be made ? I am not sure that it was not made in 1851. But be that as it may, Mr. Aldrich had a duty to perform suited to the nature of the bill before him : and he was no prophet, but was obliged to do the best he could. Did he make a very great mistake ?
*375 It must be remembered that, according to the case of Fraser vs. McClanaghan, (n) if a party entitled to the delivery of specific slaves, files a bill for that purpose, and some of the slaves die pendente lite, he is entitled to a decree for the value of the ne-groes, in lieu of, and as a substitute for the negroes themselves. It is an incident of such a case. How could Mr. Aldrich know that some of these slaves might not die during the suit ? One of them did die, and that by the hands of the defendant to the cause, and he spirited away his property in another; and shall he or his privies make advantage of his own wrong ?
It has been said there was no evidence before the Chancellor of the devastavit of the defendant by misinvesting the trust funds, and, therefore, his decree cannot have had any reference to the delivery of the slaves wrongfully purchased. Suppose this were granted, how could Mr. Aldrich know when he made his order, that there would be such an omission at the trial? But is the fact as stated? Why, — was not the bill taken fro confesso ? and had not the Chancellor the evidence of the defendant’s own admission ?
Those who will consult and carefully consider what is said by Chancellor Walworth, in Mitchell vs. Bunch, (o) in relation to practice in Courts of Equity, and particularly to the practice in the English Court of Exchequer, will hesitate much in accusing Mr. Aldrich of a very palpable blunder.
But conceding every irregularity that can be imagined, is it certain that the order, and especially the bond given under it, should be disregarded ? Is it certain that the bond was not drawn up and tendered, in the terms so much objected to, by the obligors themselves, and not extorted by Mr. Aldrich ? How can that be known, when 'the inquiry is made apart from all circumstances into the naked authority of the commissioner; *376 and the bond is to be set aside on that abstract view of the matter ?
I suppose, if the order had been for a pure ne exeat bond, the defendant in the suit might have placed a sum of money in the hands of the commissioner, to satisfy the final decree; or he might have declined to give a ne exeat bond, or ask any sureties to join him in one, if his settled intention was to leave the State never to return; and, if under these circumstances he had done either of these things, would the securities given have been void, or the commissioner wrong ?
Analogous to the last case just suggested was the case of Jessup vs. Hill, (p) where one of the defendants to the suit had been arrested upon a ne exeat, and after giving bail, by agreement the ne exeat was discharged, upon his executing bond to answer the bill and abide the final decree. A future application for the delivery up to him of this bond was refused; although under other circumstances it might have been granted.
The bond in the present case must be held, in this Court, to have been well taken. If the parties had chosen to question it, they would have been heard on a motion in equity to set it aside. And again, when the bond was ordered out of that Court for suit, they might have opposed that motion. Having neglected both these legitimate grounds of relief, they should not be heard here.
I hold it to be clear that when a security, taken in Chancery, is issued, for suit, by that court; although all extrinsic grounds of defence may be raised against it, yet the authority of the obligee, acting as the agent of the Court, to take it, can never be set up as a defence to the instrument.
I am of opinion the nonsuit should be set aside.

Motion dismissed.

 1 Hill, Cb. 14.

 3 Strob. Eq. 300; Id. 328.

 1 Bail. 294, and see State vs. Stewart, 5 Strob. 31-2.

 2 Bay, 182.

 4 McC. 233.

 4 Johns. R. 317; 5 Id. 282 ; 6 Id. 337.

 Rice, 24.

 1 N. and McC. 326.

 Toller, 76.

 1 N. and McC. 329, note.

 Irish. Term R. 1.

 2 Bail. 252.

 2 Strob. Eq. 227.

 2 Paige, 617. See also Ms observations in McNamara vs. Dwyer, 7 Paige, 244.

 7 Paige 95.